And in Matter of Mayor, White Plains Road, 106 App. Div. 133, 136, 94 N. Y. Supp. 110, 112, Second Department, the court said:

"It is clear that the proposed change of grade is an incident to the widening of the street for which this proceeding was instituted."

The objection interposed on behalf of the owner of damage parcel No. 92-A is therefore overruled.

With respect to the claim of the owners of damage parcel No. 171 for damages for the closing of Fourteenth avenue, I understand from the briefs that the Corporation Counsel and the counsel for the claimants have agreed that this claim shall be presented to the same commissioners; but whether as part of this proceeding, or as an independent proceeding, they do not seem to have wholly agreed. That matter can be determined on the settlement of the order.

Subject to proper provisions for the presentation of this claim, the report of the commissioners will be confirmed. Settle order on notice.

---

(151 App. Div. 941.)

### R. G. PACKARD CO. v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department.   June 28, 1912.)

1. MUNICIPAL CORPORATIONS (§ 360*)—CONTRACT FOR PUBLIC WORK—CONSTRUCTION.

Under a contract with a city for excavation work, setting forth an engineer's estimate of the amount to be excavated, and providing that no payments should be allowed for any work in excess of such amount plus 5 per cent.; that the estimate was approximate only and formed no part of the contract; that bidders must judge for themselves as to the amount of the work; that such estimate was not to be used for measurement or payment; but that all material was to be measured in accordance with data, part of which was not obtainable until the completion of the work; and that additional work might be done under written order from the city for a price not to exceed 5 per cent. of the contract price or total cost of the work and materials—the 5 per cent. clause referred to additional or extra work that might be done under the contract, to be computed upon the cost by actual measurement and not upon the estimated cost.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 892, 892½; Dec. Dig. § 360.*]

2. MUNICIPAL CORPORATIONS (§ 288*)—CONTRACTS—VALIDITY—APPROPRIATION.

Greater New York Charter (Laws 1901, c. 466) § 1541, which provides that no expense can be incurred in excess of a previous appropriation, does not apply to an excavation contract at a fixed rate per yard for work, the exact cost of which is not ascertainable until measurement after completion of the work; such contracts being provided for in section 149, which requires them to be indorsed by the comptroller with a certificate that there is a balance of appropriation sufficient to pay the "estimated expenses of executing such contract, as certified by the officer making the same."

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 758–761; Dec. Dig. § 288.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MUNICIPAL CORPORATIONS (§ 352*)—CONTRACT FOR PUBLIC WORK—CONSTRUCTION — EXCAVATION CONTRACT — AMOUNT OF WORK — "ACCURATE CROSS-SECTIONS"—"CORRESPONDING THEORETICAL SECTIONS"—"TYPICAL CROSS-SECTIONS"—"WORK."

A contract for the excavation of a bulkhead, the inner line of which was about 9 feet inshore from an established bulkhead line, and the base of which was to be 15 feet below mean low-water mark with allowance to the contractor for whatever he might excavate within an extra foot in each direction, specified that no payment should be made for excavation beyond those limits, "except where known loose rock is shown in the cross-sections above the top grade of the indicated rock, at a line ten feet westerly of and parallel to the bulkhead line, allowance will be made and paid for to a positive line which is forty-five degrees to the horizontal," and specified, as to "typical sections," that they were given as a guide only and to show approximately what the contractor might expect to encounter in the prosecution of the "work," and represented the "typical sections" as information upon (1) "the existing rock bottom which was the top of the loose rock; (2) the corresponding theoretical sections to be obtained, meaning the so-called nine-foot and fifteen-foot lines; and (3) the corresponding limiting lines to which payment will be made when it is impossible to produce the theoretical sections; and that all material was to be measured by comparison of 'accurate cross-sections.'" The points at which the 45-degrees lines should commence could not be ascertained before the work commenced. *Held*, that the "corresponding theoretical sections" meant the 10-foot and 16-foot lines; that the "typical" cross-sections could not be regarded as the "accurate cross-sections"; that "work" had a double meaning, and, for the purpose of fixing the beginning points of the 45-degree lines, did not begin until the blasting began, when the junctions between the loose rock and the ledge rock became "known," so as to be "indicated" upon the cross-sections made by the city after the work was completed; and that work to such junctions was necessitated and contemplated by the contract.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 883; Dec. Dig. § 352.*

For other definitions, see Words and Phrases, vol. 8, pp. 7517–7519; vol. 8, p. 7837.]

4. MUNICIPAL CORPORATIONS (§ 358*)—PUBLIC IMPROVEMENTS—CERTIFICATE OF ENGINEER—MISTAKE OF LAW.

The certificate of a city engineer as to the amount of excavation work done under a contract is disputable for mistake at law.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 890; Dec. Dig. § 358.*]

5. MUNICIPAL CORPORATIONS (§ 374*)—PUBLIC IMPROVEMENTS—CERTIFICATE OF ENGINEER—EXISTENCE OF RECORDS.

In a contractor's action to recover for excavation for a bulkhead line, to be measured by certificate of the city engineer, the existence of records of the engineer's department containing a set of cross-sections made up on the basis of soundings before completion of the work, erroneous in certain details, never approved by the engineer, and not delivered with the certificate, is sufficient to give the court jurisdiction to consider the case, although work contemplated by the contract could not be computed until after blasting had begun and the beginning points of 45-degree lines were fixed.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. § 374.*]

6. EVIDENCE (§ 594*)—ADMISSIONS—SUPPRESSING TESTIMONY.

Where all the evidence as to disputed measurements in a contractor's action to recover for excavation work was produced by the plaintiff, and the only matter of evidence arising at all upon other testimony was as

to the date when blasting work had begun, the action of defendant in putting on the stand a witness who had watched the work and had taken and preserved records of the dates, etc., without offering such record evidence, was to admit that the plaintiff's evidence as to that date was correct.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2431; Dec. Dig. § 594.*]

7. TRIAL (§ 141*)—TAKING CASE FROM JURY—WEIGHT OF EVIDENCE.
Where the plaintiff's evidence was uncontradicted, except upon a matter as to which defendant's failure to produce record evidence in its possession amounted to an admission, it was proper to direct a verdict for the plaintiff.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 336; Dec. Dig. § 141.*]

8. MUNICIPAL CORPORATIONS (§ 374*)—CONTRACT—TIME.
A contractor who establishes his right to recover under the contract is entitled to interest on the claim.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. § 374.*]

Appeal from Trial Term, New York County.

Action by the R. G. Packard Company against the City of New York. Judgment for plaintiff, and from the judgment and an order denying its motion for a new trial, defendant appeals. Judgment and order affirmed.

The following is the opinion of Whitney, J., referred to by the court:

Upon the question submitted to the jury it found for defendant. Hence the exceptions to the charge, whose discussion takes up so large a part of defendant's brief, are not material now. The exceptions to be considered on this motion are those taken to rulings upon motions to direct a verdict. Defendant's first and most confident contention is that it is entitled to a reduction of the verdict to $2,307.50. The action is brought upon a contract for excavation under water along the East River front, for purposes of a new bulkhead. The price is $9.35 per cubic yard. The amount actually paid before suit is $92,882.90. The estimated expense at the time of making the contract was $90,657.60.

[1] Defendant claims that the latter sum, plus 5 per cent. thereof, is the extreme limit of plaintiff's possible recovery. Its counsel says: "In order to make the contract definite and certain, certain clauses were inserted as follows: 'Art. 2. The engineer's estimate of the quantities of material to be excavated and removed is as follows: Total of all material 9,696 cubic yards, neat measurement.' This clause is followed by what is commonly known as the 5 per cent. clause, which reads as follows: 'No payment shall be allowed for any work in excess of the amount set forth, plus five (5) per cent. thereof.'"

If the specifications read as here stated, defendant's position would be impregnable; but the clause last quoted does not immediately follow the other. There is a long paragraph between headed "Note." This states that the 9,696 cubic yards estimate "is approximate only, and forms no part of this contract"; that bidders must "judge for themselves of the amount and other circumstances affecting the cost of the work"; that *said estimated amount is not to be used for measurement or payment;* that, on the contrary, all material is to be measured in accordance with certain *data*, part of which will not be obtainable until after completion of the work. In paragraph F of the contract to which the specifications are attached there is provision made for "additional work" that may be "done or furnished under a written order from the commissioner" for a price that "shall not exceed five (5) per

cent. of the contract price or total cost of the work and materials." I think that the 5 per cent. clause in the specifications refers to the "additional work" that might be done under the contract, and that the "total cost of the work and materials" upon which the 5 per cent. is to be computed is the cost by actual measurement, not, as defendant now contends, a provisionally estimated cost, which "is not to be used for measurement or payment." The 5 per cent. clause relates to extra work. Plaintiff claims nothing for extra work.

[2] Defendant contends that this construction makes the contract illegal because by the last clause of section 1541 of the Greater New York Charter (Laws 1901, c. 466) no expense can be incurred in excess of a previous appropriation; but this clause does not apply to contracts at a fixed rate per yard for work whose exact expense is necessarily as yet indeterminable. Such contracts are provided for in section 149, which requires them to be indorsed by the comptroller with a certificate that there is a balance of appropriation "sufficient to pay the estimated expenses of executing such contract, as certified by the officer making the same." The cases relied upon by defendant relate to claims for extra work, and their resemblance to the present case is superficial only. Matter of Morris & Cumings Dredging Co., 116 App. Div. 257, 101 N. Y. Supp. 726; Donlon Con. Co. v. City, 64 Misc. Rep. 471, 119 N. Y. Supp. 617; Dady v. City, 65 Misc. Rep. 382, 121 N. Y. Supp. 860.

[3] Passing now to the main question in the case, it is first necessary to consider the true construction of the specifications (which were drawn by an assistant engineer in the Dock Department) as to the amount to be excavated. The inner line of the new bulkhead for which the excavation was to be made was to be 9 feet inshore from the established bulkhead line. Its base was to be 15 feet below mean low-water mark. In order to be sure that enough room should be blasted out, the contractor was to be paid for whatever he might excavate as far as the 10-foot line inshore and the 16-foot line beneath; that is, an extra foot in each direction. The material to be excavated was to be solid ledge rock below, with generally an upper stratum of loose rock. The same formation generally extended for some distance inshore from the 10-foot line. Hence it was necessary to provide in the contract for getting out and carrying away the loose rock immediately adjacent to that line, for, if the loose rock should slide into the excavation while the work was going on, it would increase the amount which would have to be dug up and carried away; while, if it should slide into the excavation after the work had been finished and accepted, then the city would have to hire the contractor or somebody else to excavate again. This extra expense was therefore bound to be provided for, either as so much more cubic yardage, or by an increase in the compensation demanded by the bidders for the contract. Thus arose the provision for the 45-degree line. Forty-five degrees is the angle of safety. Hence if an imaginary 45-degree line be taken at each given point where the loose rock overlies the ledge rock on the inner line of the excavation, and running upwards and inshore, and if the loose rock be removed from above that line, the parties are fully protected.

Unfortunately, according to the undisputed evidence here, the location of the springing point cannot be accurately ascertained by soundings taken before the work commences. The so-called disc soundings show only the top of the loose rock. The so-called rod soundings are really made not with a rod, but with a pipe. When the loose stones are at all large, the pipe manifestly cannot go down very far through them, except with extraordinary luck. Hence an accurate cross-section cannot be taken at that time by soundings which can be relied upon as furnishing even approximately the location of the proper springing point of this forty-five degree line. The main specification as to the westerly limit of the excavation is as follows: "The westerly limit shall be a line nine (9) feet inshore from and parallel with established bulkhead line. * * * Payment shall not be made for material excavated at a distance inshore or westerly of the above described limits greater than one foot." Now, to provide against the loose rock, we have this exception appended to the extract which I have just quoted: "Except where *known* loose rock is shown in the cross-sections above the top grade of the *indicated* rock,

at a line ten (10) feet westerly of and parallel to the bulkhead line, *allowance will be made and paid for* to a positive line which is forty-five degrees to the horizontal." This exception is very clumsily drawn and raises various questions. "Known" loose rock—when and by what means is it to become known? "The cross-sections"—what cross-sections? "The indicated rock"—when, where and how indicated? "A positive line"—what is there positive about a line whose direction is stated, but whose starting and finishing points are not stated, whose angle may turn either up or down? I suppose that "positive" must be taken in its third sense, as defined in the Century Dictionary— "arbitrarily laid down: determined by declaration, enactment or convention and not by nature."

Now, the very next sentence of the specifications relates to certain "typical sections," and the defendant insists that these are the cross-sections referred to in connection with the 45-degree line, and that the word "indicated" means indicated on these. I think that there are various answers to this suggestion. In the first place, there are only 16 "typical sections" for over a quarter of a mile of river front, and the very fact that they are called "typical" would indicate that they do not give complete information. In the second place, the specifications go on to say that "these sections are given *as a guide only*, and show *approximately* what the contractor *may* expect to encounter in the prosecution of the work." The "allowance" to the contractor is a payment to him, and at a previous point the specifications had stated that his payment would be "measured by a comparison of *accurate'* cross-sections." In the third place, the "typical sections" are represented by the city—for the specifications are drawn by the city—as giving information upon three subjects only: First, "the existing rock bottom," which is the top of the loose rock; second, "the corresponding theoretical sections to be obtained," which means the so-called 9-foot and 15-foot lines, and the inclosed space as far out as "the *contour line*, fifteen (15) feet below mean low water"; and, third, "the *corresponding* limiting lines to which payment will be made *when it is impossible to produce the theoretical sections*," which to my apprehension means the 10-foot and 16-foot lines. In the fourth place, it was impossible before the work began, at any point except where solid rock ledge came right up to or very close to the river bottom, to ascertain where it would be necessary for the 45-degree line to spring. The specifications expressly provide that "all material of every description under the contract is to be measured by a comparison of *accurate* cross-sections." In the entire absence of accuracy about this springing point, I do not see how the "typical sections" can be regarded as the "*accurate* cross-sections," which plaintiff was thus told he could rely upon.

But the city urged on the trial that these accurate cross-sections were only to be taken "before the commencement and after the completion of the work." It asseverated that no intermediate cross-section can be considered. If so, we would be led to the result that the cross-section taken after the completion of the work is the one which must fix the springing point, and that it was error to exclude plaintiff's calculation based on that hypothesis, for, if the original and the final soundings were the only ones that can be considered, then it seems clear that the original ones must be taken for the top surface of the excavation, and the final ones for the bottom surface of it, and the actual springing point is located at the bottom surface, while the point to which a pipe would pierce at the time when the top surface is being sounded has no relation to the proper springing point at all. But the plaintiff's hypothesis was rejected for two reasons: First, that it would subject the city to the danger of fraud; and second, that it would leave no function for the words "known" and "indicated" in the specifications.

It seems to me impossible to reach a reasonable conclusion without assuming that there is some word in these specifications which is used with a double meaning, and a reasonable result can be reached if a double meaning is attributed to the word "work" in the clause which I have last quoted. The first step taken by plaintiff was to go over the whole area with what is called a clamshell dredge and carry away all the loose rock which can easily be removed by that means. It is fair to assume that whatever loose rock was left after this operation either that it was so small in amount that it

was cheaper for plaintiff to let it slide into the excavation and scoop it out again without additional compensation than to go on clamshelling for it any more, or else so large that it had a good chance of staying where it was until the cavity was excavated and walled up again. As soon as the clamshell work was completed, and (except in the locality as to which defendant has a verdict) before blasting began, the city made a careful series of measurements over the whole area with both disc and rod. I think that for the purpose of fixing the springing point the "work" may be said not to have been begun until the blasting began. Then the junction between the loose rock and the ledge rock became "known" within the meaning of the specifications, and it should have been so "indicated" upon the cross-sections which were made by the Dock Department after the whole work was completed. This was not done. The soundings made by the city after the clamshell dredging were not used by the assistant engineer in making up the computation upon which the chief engineer's certificate was based. Instead, he used the old pipe soundings made before the contract was let, and when the line between the loose rock and the ledge rock was impossible of ascertainment. This deprived the contractor of any compensation for a very considerable amount of work, no part of which was "extra work" or "additional work" in any proper sense, but all of which work was necessitated and contemplated by the contract. It is not fair, and I do not think that it was good law.

[4] So far as the chief engineer's certificate in this case was based merely upon miscalculation, the jury was directed to find in favor of the defendant. But so far, and so far only, as it was based upon a palpable mistake of law—upon misconstruction by an assistant engineer of the specifications which he himself had been permitted to draw—the direction was in favor of the plaintiff. Such a certificate is disputable for mistake of law. Burke v. Mayor, 7 App. Div. 128, 40 N. Y. Supp. 81. It has, indeed, been ruled that a mistake, in order to be the basis of relief, not only must be palpable, but "in general * * * must appear on the face of the award or in some paper delivered with it," and the rule is sometimes stated without the qualifying phrase "in general." Sweet v. Morrison, 116 N. Y. 19, 32, 33, 34, 22 N. E. 276, 15 Am. St. Rep. 376; Smith v. Mayor, 12 App. Div. 391, 394–395, 42 N. Y. Supp. 522. But the question does not seem to have been necessary to the decision, and in the Burke Case the mistake does not seem to have been apparent upon the face of the certificate. The rule in a case like this may be somewhat different from that applicable to an award upon a voluntary arbitration between private parties.

[5] The records of the Dock Department contain a set of cross-sections made up on the basis of these intermediate soundings, and while those cross-sections are erroneous in certain details, and never were approved by the chief engineer, and were not "delivered with" the certificate, I think that their existence is sufficient to give jurisdiction to the court to consider the case. As to that part of the work for which a verdict was directed there was no dispute of fact and no question proper for a jury to pass upon. The assistant engineer, who was responsible for the chief engineer's certificate, practically agreed with plaintiff in the computation when he used the method of computation upon which the certificate had been based.

[6] All the evidence as to the measurements upon which the certificate had been based, and as to the measurements made by the city after the clamshelling was finished and before the blasting began, was dragged by plaintiff's counsel out of the city's archives and its employés. The only piece of evidence which to any extent rested upon other testimony was the date when blasting began; and this stands undisputed, although the city put upon the stand an inspector of the Dock Department who had followed and watched the plaintiff's employés during the entire course of the work, taking and preserving accurate records of the date and location of every act of drilling and blasting by them. To put such a witness upon the stand, and then not to bring out the documentary evidence which he had prepared as to the dates in question, was to admit that plaintiff's evidence as to those dates was correct. See McGuire v. Hartford Fire Insurance Co., 7 App. Div. 575, 590, 40 N. Y. Supp. 300; Reehil v. Fraas, 129 App. Div. 564, 114 N. Y. Supp. 17, and cases cited.

[7] Under such circumstances it was proper to direct a verdict upon plaintiff's uncontradicted testimony. Hull v. Littauer, 162 N. Y. 569, 57 N. E. 102.

[8] The only question raised by defendant's brief is that of interest, to which I entertain no doubt that plaintiff is entitled. Sweeny v. City, 173 N. Y. 414, 66 N. E. 101.

The case is difficult, but not extraordinary. Hence there is no jurisdiction to consider plaintiff's motion for an allowance. That, as well as defendant's motion for a new trial, must be denied.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, SCOTT, MILLLER, and DOWLING, JJ.

F. Nevius, for appellant.
C. L. Barber, for respondent.

PER CURIAM. Judgment and order affirmed, with costs, on the opinion of Mr. Justice Whitney in the court below on the motion made by defendant for a new trial. Order filed.

───────

## SIEBRECHT v. SIEBRECHT.

(Supreme Court, Special Term, Westchester County. October, 1911.)

HUSBAND AND WIFE (§ 48*)—CONVEYANCE OF PROPERTY—AGREEMENT TO RE-CONVEY—EVIDENCE.

A wife about to undergo a serious surgical operation having conveyed her property to her husband, evidence *held* insufficient to warrant a finding that such conveyance was made on his promise to reconvey in case she recovered.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 242–248; Dec. Dig. § 48.*]

Suit by Julia W. A. Siebrecht against Henry A. Siebrecht, Jr., to compel a reconveyance of certain premises. Judgment for defendant.

Henry G. K. Heath, of New York City, for plaintiff.
John M. Gardner, of New York City, for defendant.

MILLS, J. This is an action in equity brought by plaintiff, a wife, to compel the defendant, her husband, to reconvey to her certain premises, land and house, situated on North avenue in the city of New Rochelle, which she, in January, 1908, conveyed to him, and upon which, at that time, they, with their children, resided. When such conveyance was made, she was about to go to a hospital and undergo there a serious operation. She went on the 12th of February following, the deed having been acknowledged on the 31st of January, was operated upon, recovered, and returned to their home. Subsequently, various marital differences having arisen between the parties, or at least having become acute, she demanded that the husband reconvey the premises to her. He refused, and this action resulted.

The case is a difficult one to decide. I cannot but feel a strong sympathy with the plaintiff as a wife and mother who seems to have re-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes